IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SEAN TATE,

                  Plaintiff,

      v.                                    OPINION and ORDER

KEVIN CARR, LIZZIE TEGELS, TAMMY WALDERA,        20-cv-302-jdp
MS. MEIDAM, and T. KUCHINSKI,

                  Defendants.

---

       Plaintiff Sean Tate, appearing pro se, is a practicing Muslim and a former state of Wisconsin prisoner. Tate alleges that when he was incarcerated, prison officials punished him for refusing to participate in actuarial risk assessments that violated his religious beliefs and ultimately coerced him into participating in such an assessment. Tate brings First Amendment claims and a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA).

       The parties have filed cross-motions for summary judgment. Dkt. 47 and Dkt. 60. The evidence here suggests that inmates might face negative consequences for failing to participate in the assessments. But Tate's claims fail for a variety of reasons, chiefly that he fails to show that the use of actuarial assessments violated his sincerely held religious beliefs and that defendants are entitled to qualified immunity. Tate would not be entitled to injunctive relief under RLUIPA because he is no longer incarcerated in the Wisconsin prison system. Accordingly, I will deny Tate's motion for summary judgment, grant defendants' motion for summary judgment, and dismiss the case.

UNDISPUTED FACTS

The following facts are drawn from the parties' proposed findings of fact and supporting evidence and are undisputed unless otherwise noted.

**A.  Parties**

Plaintiff Sean Tate is a practicing Muslim. Tate is a former state of Wisconsin prisoner; the events in question took place when Tate was incarcerated at Oshkosh Correctional Institution (OSCI) and Jackson Correctional Institution, both medium-security institutions.

Defendants Melissa Meidam and Christopher Kuchinski worked at OSCI; Meidam was a social worker and Kuchinski was a unit manager. Defendants Lizzie Tegels and Tammy Waldera worked at Jackson Correctional Institution. Tegels was the warden. Waldera was a classification specialist. Defendant Kevin Carr is the secretary of the Wisconsin Department of Corrections.

**B.  COMPAS**

This case concerns the Department of Corrections' use of an actuarial assessment system called COMPAS (Correctional Offender Management Profiling for Alternative Sanctions). COMPAS was designed by Northpointe, Inc. to assess offenders' risk of recidivism and criminogenic needs that might affect future criminal behavior.

The version of the COMPAS assessment used here, the COMPAS Legacy assessment, consists of 88 questions that focus on an inmate's current offenses, criminal history, institution conduct history, classification history, possible gang affiliations, substance use, education, mental health, work and financial history, criminal thinking, and a self-report of the inmate's present attitudes. Most of those questions can be answered in advance by prison staff, usually a social worker. Only about 30 questions in the "self-report" section need to be answered

directly by the prisoner. Using this data, the COMPAS software generates a report assessing a prisoner's criminogenic needs and risk of recidivism.

The DOC uses COMPAS assessments in various ways, mainly to determine a prisoner's programming needs—such as anger management, substance-use disorder, cognitive-behavioral, and employment programming—and creating rehabilitative goals. In particular, the Bureau of Classification and Movement uses the results at each inmate's annual reclassification proceedings.

Defendants state that prisoners have the right to refuse a COMPAS assessment for any reason, religious or secular, and that staff will assign programming based on other available information. But they acknowledge that an inmate's refusal to participate in a COMPAS assessment may affect a prisoner's custody level because the refusal is sometimes construed as evidence of the inmate's unwillingness to address program needs and participate in programming, thus raising his risk level.

## C. Tate's assessment

On June 30, 2015, Tate's social worker, defendant Meidam, called him into her office and said they should complete Tate's COMPAS Legacy assessment. Meidam does not recall the details of the conversation. Tate says that Meidam told him that he did not have to take the assessment and that she didn't believe that COMPAS "can predict the future of a person, it's like witchcraft." Dkt. 46, at 29. Tate says that Meidam's use of the word "witchcraft" concerned him, because fortune telling and numerology is forbidden in Islam. Tate says that he told Meidam that he didn't want to take the assessment because "Islam forbids us from participating in anything like that," and that Meidam responded, "Well, if I was you, I wouldn't take it. . . . It will save me a lot of work." *Id.* at 31. Meidam also suggested that the COMPAS

report might produce results forcing additional programming on Tate or keeping him longer in prison. Tate declined the COMPAS assessment. According to Tate, Meidam said that she would report that Tate would take the assessment another time so that his refusal wouldn't be used against him, and that although she'd be recommending that Tate stay in medium security at OSCI, it was up to a committee to decide his next placement. Meidam's contemporaneous notes reflect Tate's refusal but not Tate's reasoning or the details of their conversation.

A short time later, Tate spoke with defendant Kuchinski about his chances of being transferred to a minimum-security institution. Kuchinski does not recall this discussion. Tate says that Kuchinski pulled up Tate's classification file and told him, "Well, these negative comments are going to stop you from going anywhere." *Id.* at 34. Tate asked Kuchinski what he meant, and he responded, "Did you refuse—you refused the COMPAS? And the comments that Meidam made in your record." *Id.* Kuchinski said, "By you refusing this, it's going to be used against you." *Id.* Kuchinski read Tate a portion of a report stating, "Mr. Tate appears to demonstrate a low overall level of motivation to make positive life changes. He appears to place high demands on others and fails to accept responsibility for his own behavior." *Id.* at 37.

This spurred Tate to change his mind about taking the COMPAS test even though be he believed that Islam forbid him from participating in fortune telling or numerology. On July 14, 2015, Tate completed his COMPAS interview with a nondefendant social worker.

The COMPAS Legacy assessment results showed that Tate scored "high risk" for violent recidivism and "medium risk" for general recidivism. Tate scored "probable' in "re-entry cognitive behavioral" and "high" in "criminal involvement."

**D. Reclassification hearing**

On July 22, 2015, Tate had his annual reclassification hearing before the Program Review Committee at OSCI to review his custody, institution placement, and programming needs. The reclassification process includes a prehearing interview between an inmate and his social worker—in this case, defendant Meidam—who makes a recommendation to the committee. Institution staff also document the inmate's offense history, institutional adjustment and conduct, program needs, and completed programming. Based on this information, staff make recommendations regarding custody classification, placement, and program needs. The committee also considers the inmate's opinion.

In Tate's prehearing report, defendant Meidam noted that Tate had received two minor conduct reports since his last hearing, one for fighting and one for damage or alteration of property. Under the "Staff Appraisal and Recommendations (Pre-Hearing)" section, the report also stated the following:

> Medium custody with continued placement at OSCI is recommended due to
>
> Sentence structure
>
> Current offense
>
> Unsatisfactory institution adjustment including receipt of Conduct Reports since last review. Mr. Tate appears to demonstrate a low overall level of motivation to make positive life changes. He appears to place high expectations/demands on others and fails to accept responsibility for his own behavior. Mr. Tate refused to complete the COMPAS Legacy Assessment and COMPAS Unified Case Plan in preparation for this review. Mr. Tate is encouraged to improve and maintain positive institution adjustment and adherence to behavioral expectations. Did complete DAI Legacy on 7/14/15 with Ms. Cleary.

Dkt. 56-1, at 17. It is unclear which staff member or members authored this note; three different staff members' names, including Meidam's, appear on time stamps associated with the note. But Tate says that Kuchinski had previously told him that Meidam had written the part about his "low overall level of motivation" as part of her negative comments following his refusal to take the COMPAS assessment. Meidam does not recall which portions she wrote. For purposes of summary judgment I will assume that Meidam wrote the entire note.

The committee recommended keeping Tate in medium custody at OSCI, stating as follows:

> Institution adjustment has remained manageable during the period of review. Risk associated with significant length of projected time to serve precludes custody reduction. Nature of offense including the loss of life is noted. Risk associated with criminal involvement and substance abuse is expected to be mitigate[d] through eventual completion of recommended programs. Assessed risk and needs may be addressed in current custody and placement. Therefore, there are no compelling reasons for transfer at this time. Expectations are to maintain positive adjustment. A 12 month recall will be set.

*Id.* at 19. This recommendation was approved.

The committee also assigned Tate the "cognitive group intervention program" based on Tate scoring "high" in criminal involvement and "probable" in re-entry cognitive behavioral on his COMPAS assessment.

**E.  Events after the hearing**

Tate did not understand why his COMPAS results scored him as such a high risk. He found that some inmates with more serious convictions scored lower than he did. He appealed the COMPAS assessment but that appeal was rejected.

Tate's 2015 COMPAS refusal was not noted in following reclassification reports. In 2016, Tate was transferred to another medium custody prison, Fox Lake Correctional

Institution. In 2017, the committee transferred Tate to Jackson Correctional Institution (JCI), also a medium custody prison, for enrollment into AODA treatment.

In May 2018, Tate wrote a letter to defendant JCI Warden Tegels, asking that she correct the inaccurate information in his COMPAS results. Tegels wrote back, stating that her office had no responsibility for such decisions and that Tate should raise the issue with his social worker or at his next reclassification hearing. Shortly thereafter, Tate wrote to defendant Waldera, the classification specialist at JCI, about removing inaccurate information from his COMPAS report. Waldera responded, "I do not have any part in completing the COMPAS assessment. You can speak to your social worker and/or Unit Manager if you believe false information was used." Dkt. 63-15, at 2. Tate's social worker and unit manager at JCI told him to write to the person who had administered the assessment. Tate wrote to the OSCI COMPAS coordinator, but that letter was returned to him because that person no longer worked at OSCI.

Tate then filed a "request for new religious practice or property form" asking to be allowed to refuse taking COMPAS assessments without punishment. A member of the Religious Practices Advisory Committee wrote back, stating that the issue was moot because prisoners already had the right to refuse the assessment.

In April 2019, Tate wrote to defendant Waldera, asking that his entire COMPAS result be removed because he had been forced to take it over his religious objection and because it contained inaccurate information. Waldera responded, stating that the assessment "will stand as is" as well as the following:

> You were never forced to participate in this assessment. You may have refused the assessment, but by refusing participation you show you are not willing to address your program needs and participate in the programming the assessment may point out you need to aid with success upon release. This factor will then raise your risk level and this could in turn affect your custody level

considering the safety and security of the institution and the public.

Dkt. 63-8. Defendants state that Waldera did not say this for retaliatory purposes, but rather she was restating information from the DOC's COMPAS operations manual, which states that inmates refusing the assessment "will be informed of the possible impact(s) of their decision which includes but is not limited to" effects on their program enrollment, ability to develop a unified case plan, and classification or parole decisions. Dkt. 63-9.

Later in 2019, after completing various programming, Tate was transferred to a minimum-security prison. He was paroled in 2021.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

I granted Tate leave to proceed on the following First Amendment claims:

- Defendant Meidam violated Tate's free exercise rights and retaliated against him by lying to him about there being no negative consequences for refusing a COMPAS interview on religious grounds and then placing negative information in his file because of his refusal.

- Defendants Waldera, Kuchinski, and Tegels violated Tate's free exercise rights by passing the buck about who had the authority to fix the problems with his COMPAS file, leaving him with no recourse.

- Defendant Waldera violated Tate's free exercise rights and retaliated against him by refusing to remove negative information from his file and reiterating that he would be negatively assessed for refusing to participate in COMPAS interviews.[1]

---

[1] Defendants also discuss a claim that Kuchinski pressured Tate into taking a COMPAS interview by telling him that his refusal to take it when offered by Meidam would lead to negative information being placed in his reclassification file. But I did not grant Tate leave to proceed on such a claim, so I need not discuss it further in this opinion.

Defendants contend that two of these claims—the retaliation claim against Meidam and the free exercise claim against Kuchinski—should be dismissed under the doctrine of laches because Tate filed this lawsuit about five years after the events at issue and neither defendant had any memory of the conversations that Tate alleges they had.

"The doctrine of laches is derived from the maxim that those who sleep on their rights, lose them." *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002). Laches bars a claim "when the plaintiff's delay in filing the claim (1) is unreasonable and inexcusable, and (2) materially prejudices the defendant." *Smith v. Caterpillar, Inc.*, 338 F.3d 730, 733 (7th Cir. 2003). Tate doesn't explain why he waited so long to file his lawsuit. Although he includes claims about events occurring as late as 2018, the real damage to his religious rights he alleges he suffered occurred in 2015 when he felt compelled to participate in a COMPAS interview.

But even if Tate unreasonably delayed in filing his claims against Meidam and Kuchinski, defendants fail to show that they were prejudiced by the delay. As I will discuss below, the summary judgment record makes clear that Kuchinski was not actually involved in conversations that are the subject of Tate's claim against Kuchinski, so that claim is easily dismissed on the merits regardless of Kuchinski's recollection of events.

As for defendant Meidam, she states that she doesn't remember (1) the conversation with Tate in which he alleges she told him that there would be no repercussions if he refused the COMPAS assessment; or (2) which parts of Tate's reclassification-hearing report were authored by her as opposed to other prison staff noted on the report's timestamps. Memories understandably fade over time but there is no indication that Meidam's memories would have been any better if Tate had filed his lawsuit within a year or two of the 2015 events. Prison staff have countless routine conversations with hundreds of prisoners, and the events here were

not so noteworthy so as to assume a person would have a vivid memory of them. Commonly in these types of cases prison staff use contemporaneous documents to refresh their recollections.

Here, there are contemporaneous documents authored by Meidam, but is it Meidam's and the DOC's own fault that those documents are unhelpful. Meidam recorded a note from their June 2015 conversation but it states only that Tate refused to take the COMPAS assessment; other notes from that same log, including another authored by Meidam on another date, summarize conversations with Tate in much more detail. *See* Dkt. 58-1. Meidam could have taken more comprehensive notes but chose not to. And the question of authorship of aspects of Tate's reclassification-hearing report is difficult to answer because that document contains multiple timestamps with different authors without explaining how each timestamped author edited the document. That's the fault of the DOC's own recording system, not Tate's. I will not invoke laches to cover for defendants' own shoddy recordkeeping.

## A.  Free exercise claims

### 1.  Defendant Meidam

I turn to the substance of Tate's First Amendment free exercise claims. Tate alleges that Meidam told him that he could refuse to take the COMPAS assessment on religious grounds but after he refused, she placed his refusal and other "negative information" in his file. He states that this coerced him into taking the COMPAS assessment shortly thereafter, in violation of his religious beliefs.

In screening Tate's First Amendment's claims I noted that the exact standard to apply to prisoner religion claims remains unclear. Generally, a plaintiff must demonstrate that he has a sincere religious belief and that defendants "placed a substantial burden on his religious

practices." *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019); *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). Government regulations of general applicability—those not intended to discriminate against particular religion or religious sect—are usually permissible under the First Amendment. *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990). But in the prison context, the Supreme Court and the Seventh Circuit Court of Appeals have applied pre-*Smith* precedent, which asks whether restrictions on the prisoner's exercise of religion are reasonably related to a legitimate penological interest. *See, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987); *Neely-Bey*, 912 F.3d at 1003. This requires the court to consider four factors: (1) whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest; (2) whether the prisoner retains alternatives for exercising the right; (3) the impact that accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *O'Lone*, 482 U.S. at 350–52 (citing factors articulated in *Turner v. Safley*, 482 U.S. 78, 89–91 (1987).

Regardless of the precise standard, defendants contend that Meidam didn't violate Tate's free exercise rights because the use of COMPAS doesn't violate Tate's own stated religious beliefs. Tate states:

> Islam forbids a Muslim to take or participate in, anything that claims it can predict the future, actions or events of a person, as these claims are based on magic, fortune-telling, and numerology. In other words, a belief that certain numerological patterns can predict the future actions/events of a person, runs counter to the core Islamic beliefs, practices and principles.

Dkt. 63, at 1.

Both sides have presented expert testimony on Islam. Tate submits a report from Nathaniel Hakim Crampton, a community organizer and education advocate who holds a

"Ijaza or Certificate of Permission to Teach Islamic Principles of Iman (Faith), Islam (Practice/Law), and Ihsan (Spiritual Virtue)" and has authored textbooks on "Islamic Scholarship." Dkt. 45 at 5.[2] Defendants submit a declaration from non-retained expert Daniel Coate, the chaplain at Fox Lake Correctional Institution who has been a practicing Muslim since 2002.

Tate's expert Crampton states that Islam defines fortune telling as "forecasting the future, based upon conjecture, assumptions, readings, etc," and defines numerology as "using random numbers, sequences, calculations, and other assumptions to predict the future." Dkt. 45, at 3. Crampton compares COMPAS to the use of "divining arrows," a method of fortune telling. *Id.* at 4.

Defendants agree that fortune telling and numerology is forbidden by Islam. But they argue that Crampton's analysis misunderstands how COMPAS works. Their expert Coate states that numerology and fortune telling is barred by Islam because they rely on magic, the occult, or "knowledge of the unseen." Dkt. 55 at 2, ¶ 9. COMPAS, on the other hand, relies on analysis of statistical and actuarial data, much like a meteorologist relies on past weather data to make predictions about the future. They argue that Tate's view that COMPAS is fortune telling is based only on "'unreasoned say-so'" insufficient to create a triable issue. Dkt. 48, at 22 (quoting *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) ("We doubt that keeping these books out of the prison substantially burdens anyone's religious exercise. Borzych's only evidence on this point is his unreasoned say-so, plus equivalent declarations by

---

[2] Crampton's report was amended after I ordered Tate to fix technical defects with Crampton's disclosures. *See* Dkt. 41.

other inmates. . . . No objective evidence supports his assertion that the books are important to Odinism.")).[3]

I agree with defendants on this point. It is undisputed that Tate has a sincere religious belief that he cannot participate in fortune telling or numerology, as acknowledged by experts from both sides. What ultimately matters here is Tate's own religious belief, not official Islamic doctrine. *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) ("Courts are not arbiters of scriptural interpretation."). But Tate's objection to COMPAS is based on Islam's ban on fortune telling or numerology, and Tate does not contend that he holds beliefs that are idiosyncratic to his expert's reading of standard Islamic doctrine.

The problem for Tate is that neither he nor Crampton persuasively show that COMPAS violates the Islamic ban on fortune telling or numerology. They don't assert that COMPAS is based in magic or the occult—for good reason, because no reasonable jury would agree that it is. COMPAS uses data and numbers, but it isn't numerology as Crampton defines it. COMPAS doesn't make predictions from *random* numbers or ascribe occult meaning to any numbers. It uses data reasonably related to an offender's likelihood to reoffend to predict that likelihood.

Crampton's bottom line is that "[b]ecause the COMPAS Core uses a collection of information to make a probable assumption regarding possible future behavior, the COMPAS Core functions like 'divining arrows;' which is a method of Fortune Telling." Dkt. 45, at 4. But Crampton's contention that any prediction of future behavior is akin to divining arrows or a method of fortune telling is patently unreasonable. Crampton doesn't state that Islam forbids

---

[3] The relevant discussion is *Borzych* concerned a RLUIPA claim, not a free exercise claim, but "the same definition of 'substantial burden' applies under the Free Exercise Clause, RFRA and RLUIPA." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008).

the use of all predictive methods, including actuarial science, meteorology, or even basic social cognition. Predictions about future events or conduct are ubiquitous in everyday life. Taken to this extreme, Tate would have a religious objection to any attempt by the Program Review Committee to assign Tate a security level, because it would inevitably require some prediction of his future conduct. No reasonable jury could conclude, on the record here, that COMPAS involves the type decision-making that would violate Tate's sincerely held religious aversion to numerology and fortune telling. His free exercise claims fails on the merits because it is based on a factually incorrect understanding of COMPAS.

But even if Tate had a properly religious objection to COMPAS, his claim against Meidam would still fail under the standards applicable to free exercise claims. As I stated above, the precise legal standard remains unclear, specifically whether the *Smith* test or the *Turner* factors should apply. If *Smith* is the correct test, then Tate's claim against Meidam is clearly meritless. The DOC's rule that inmates must take the COMPAS assessment or potentially face negative consequences is a neutral law of general applicability; it doesn't target religious practice. Such a law "is constitutional if it is supported by a rational basis." *Illinois Bible Coll. Assoc. v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017). DOC staff has a rational basis for making inmates take the COMPAS assessment: they believe that it will help them determine programming needs and rehabilitative goals, which in turn can affect where inmates should be housed. That Tate's religious practice was incidentally affected by the generally applicable COMPAS rule is not enough to prevail on a free exercise claim.

If the *Turner* factors are the appropriate test, Tate's claim has only marginally better prospects. The first *Turner* factor—whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest—is often viewed at the most important

14

factor. *Singer v. Raemisch*, 593 F.3d 529, 534 (7th Cir. 2010) ("The four factors are all important, but the first one can act as a threshold factor regardless which way it cuts."). In evaluating whether there is a valid, rational connection between a restriction and the state's legitimate penological interests, the initial burden of proof rests on the defendant state officials. *Id.* at 536–37. Once the defendants offer a "plausible explanation" for the restriction, the burden shifts to plaintiffs to present evidence undermining the state officials' explanation. *Id.* Defendants state a plausible explanation for requiring COMPAS—so that they can properly assess programming needs and rehabilitative goals. Tate doesn't rebut this. So the first and often decisive factor favors Meidam.

Defendants contend that the remaining factors also cut in their favor, but their argument relies in large part on their statements that Tate could opt out of the COMPAS assessment without negative consequences. Inmates are not directly punished for a refusal with a conduct report or other discipline, but those are not the only consequences that an inmate might face. The thrust of Tate's claim is that Meidam put "negative information" in his file because he refused the test. The DOC's COMPAS operations manual explicitly states that inmates refusing the assessment may face negative consequences regarding program enrollment, ability to develop a unified case plan, and classification or parole decisions. Dkt. 63-9. Declarations from DOC officials, including defendant Waldera, confirm this. Prison officials could easily accommodate religious refusals by specifically noting that the inmate refused for religious reasons, thus avoiding the impression that the inmate's refusal demonstrates resistance to rehabilitation.

Nonetheless, even if there were merit to claim under the *Turner* standard based on Meidam's decision to note Tate's refusal on the reclassification report, she is entitled to summary judgment under the doctrine of qualified immunity.

Qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Tate bears the burden of demonstrating that his rights were clearly established to overcome qualified immunity. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). He fails in that burden because he does not cite any authority—and I am unaware of any—clearly establishing that prison officials violate the First Amendment by noting a religious objector's refusal to participate in an activity like the COMPAS assessment.

Tate contends that his claim against Meidam goes beyond just her noting his refusal. Tate alleges that Meidam lied in their interview when she said that it would be fine for him to refuse the test and then later punished him with a negative report. I take him to be saying that the "negative information" Meidam placed in her report included the statements "Mr. Tate appears to demonstrate a low overall level of motivation to make positive life changes. He

appears to place high expectations/demands on others and fails to accept responsibility for his own behavior." Dkt. 56-1, at 17. Tate cites those remarks as the reason he felt forced into taking the COMPAS assessment later. Tate might have a claim that would surmount a qualified immunity defense if he could show that Meidam intentionally punished him for his Muslim faith or coerced him into violating his religious principles.

The problem for Tate with this aspect of his claim is that he doesn't explain why he thinks that Meidam made her critical statements because of his Muslim faith or because of his COMPAS refusal. Meidam was his social worker who was filling out portions of the reclassification report based on multiple sources of information, including reviews of his file and prison disciplinary records and a conversation with him. Tate's refusal to take the COMPAS assessment was only one piece of information.

On its face, Tate's COMPAS refusal wouldn't seem to have anything to do with Meidam's statements about Tate's high expectations or demands of others or whether he accepted responsibility for his behavior. To the contrary, Meidam explicitly noted that she thought he had "unsatisfactory institution adjustment" at least in part because of conduct reports he had received, and she noted that his "statement/motivation" regarding his felony murder offense had not changed—that he continued to maintain that he was not the person who cause the death. Dkt. 56-1, at 14, 17.

Given the abundant negative information in his record, Tate can only speculate that Meidam wrote the part about him "demonstrat[ing] a low overall level of motivation to make positive life changes" specifically because of the COMPAS refusal. *See, e.g., Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or

conjecture will not defeat a summary judgment motion." (citation omitted)). Although Tate does not phrase it exactly this way, I take him to be contending that Meidam's desire to punish him for his refusal can be inferred from the mismatch between her demeanor at their pre-hearing conversation and the disapproving tone of her following report. That is, Tate believes that Meidam tricked him into thinking that he would face no consequences for refusing the COMPAS assessment, including by telling Tate that she would (falsely) report that Tate planned to take the assessment later. In his deposition, Tate stated, "So what I took from our conversation was that everything was good and there was no problem." Dkt. 46, at 37.

Ultimately, Meidam noted only Tate's refusal, not that he intended to take the assessment later, but that alone isn't a reason to think that she meant to trick him or punish him for refusing the test. The evidence shows that—whatever Tate thought about the tone of their conversation—Meidam was dissatisfied with his behavior in prison. And Tate's deposition testimony shows why he should not have assumed that "everything was good": he stated that Meidam told him that she was going to "recommend that [Tate] stay [at OCI]" but that the committee "can overrule my decision," indicating that she was not going to recommend the transfer to minimum security that he wanted. *Id.* at 10. The only reasonable inference from the evidence is that Meidam intended to place negative information in her report regardless of the COMPAS refusal. Tate fails to adduce evidence that could lead a reasonable jury to conclude that Meidam expressed disapproval in the classification report because of Tate's COMPAS refusal or because of his Muslim faith. Therefore, I will deny Tate's motion for summary judgment and grant Meidam's motion for summary judgment on this claim.

### 2.  Defendants Kuchinski, Tegels, and Waldera

I granted Tate leave to proceed on claims that defendants Kuchinski, Tegels, and Waldera passed the buck about who had the authority to fix what he believed was incorrect information in his COMPAS report, thus turning a blind eye to a DOC practice negatively assessing inmates who refused COMPAS assessments for religious reasons. Waldera also later refused to remove his COMPAS assessment and reiterated that a refusal to take a COMPAS assessment would "show you are not willing to address your program needs," which "will then raise your risk level." Dkt. 50-1, at 2.

The summary judgment record shows that Kuchinski had no direct involvement in this part of Tate's claims. Tate did not speak with or write to Kuchinski after taking the COMPAS assessment: the "unit manager" he spoke to about the problem was someone at the prison he was transferred to after the COMPAS assessment, not Kuchinski. So I will dismiss this claim against Kuchinski.

As for Tegels and Waldera, the summary judgment record shows that Tate wrote to them asking to have the results of his COMPAS assessment removed from his record because they were inaccurate and because he was forced to take the assessment over his religious objection. That evidence doesn't support the actual free exercise claims that I granted him leave to proceed on against these defendants: that they enforced a practice negatively assessing inmates who refused COMPAS assessments for religious reasons. There were indeed negative consequences for Tate initially refusing to take the assessment: Meidam noted his refusal in his record. But Tate didn't ask Tegels or Waldera to remove mention of his refusal; he asked to them to remove the COMPAS results themselves after he belatedly agreed to take the assessment. However, there is no evidence that the actual COMPAS results—regardless of their

accuracy—were the result of his initial religious refusal. So he fails to show that Tegels or Waldera turned a blind eye to negative consequences from Tate's initial refusal.

I take Tate to now be arguing something different: that Tegels's and Waldera's failures to do anything about the inclusion of what he believes was inaccurate COMPAS-assessment data in his file violated his free exercise rights because he was pressured into taking that assessment over his religious objection. But Tegels and Waldera didn't pressure Tate into taking the assessment in the first place. Tate doesn't explain why *keeping* the COMPAS assessment in his file violated his First Amendment rights. His belief that the assessment was inaccurate is immaterial to his religion claims; the problem is that he had to take it at all, regardless of the accuracy of the test.

But even assuming that Tate could bring a free exercise claim against Tegels and Waldera for keeping the COMPAS information in his file, I conclude that these defendants, too, would be entitled to qualified immunity. I am unaware of any authority suggesting that Tate's religious practice was substantially burdened by the ongoing inclusion of the COMPAS results on his records. Even if Tate had been coerced into taking the COMPAS assessment in violation of his free exercise rights, the ongoing inclusion of the test results following that coercion does not violate clearly established free exercise law. So I will deny Tate's motion for summary judgment and grant defendants' motion for summary judgment on these claims.

## B. Retaliation

I granted Tate leave to proceed on First Amendment retaliation claims against Meidam for placing negative information in her reclassification report after his initial COMPAS refusal and against Waldera for failing to remove negative information from his file and reiterating that he would be negatively assessed for refusing to interview.

To prevail on a First Amendment retaliation claim, a plaintiff must show that: (1) he engaged in activity protected by the First Amendment; (2) the defendant took actions that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in the defendant's decision to take those actions. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

I granted Tate leave to proceed on these claims under a theory that prisoners retain a limited right not to speak so long as it does not interfere with legitimate penological interests. *See* Dkt. 11, at 7. Such a theory cannot succeed given my rulings on Tate's underlying First Amendment free exercise claims: at a minimum the same qualified immunity that applies to Tate's free exercise claims would also apply to the retaliation claims for the same actions. Tate also fails to show that Waldera's actions had anything to do with his arguably protected speech: Tate asked her to remove his COMPAS results from his file, not the note about his initial refusal, and Waldera's comment that refusals could result in negative consequences did not harm Tate, who was not asked to take another assessment during his time in DOC prisons.

## C. RLUIPA

I granted Tate leave to proceed on a claim under RLUIPA because he alleged that defendants forced him to choose between violating his religious beliefs by participating in COMPAS interviews or refusing to interview and facing harsher prison security conditions or more difficult parole proceedings.

RLUIPA prohibits correctional facilities receiving federal funds from imposing a substantial burden on a prisoner's religious exercise unless the burden is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)–(2).

But if a plaintiff prevails on a RLUIPA claim, he is limited to declaratory and injunctive relief; he cannot obtain money damages. *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012).

I agree with defendants that Tate's RLUIPA claim is now moot. To obtain prospective relief, there must be a risk that the defendant will violate the plaintiff's rights again. *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 395 (7th Cir. 2019). The general rule is that a request for prospective relief becomes moot if a prisoner is transferred because it is unlikely that the prisoner will be subjected to the same conditions again. *Thompson v. Bukowski*, No. 18-3009, 812 Fed. App'x. 360, 2020 WL 2097278, at *2 (7th Cir. May 1, 2020); *Maddox v. Love*, 655 F.3d 709, 716–17 (7th Cir. 2011); *Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009).

Here, Tate was not only transferred out of Oshkosh Correctional Institution, where he says that he was coerced into taking the COMPAS assessment, he has now been released from prison altogether and is now out on parole. Tate no longer faces a strong enough possibility of being harmed by the DOC's COMPAS policies to keep his RLUIPA claim alive. *Cf. United States v. Shorter*, 27 F.4th 572, 576 (7th Cir. 2022) ("our conclusion [of mootness of challenge to compassionate release decision] does not change even though Mr. Shorter hypothetically could return to prison through a violation of the conditions of either his home confinement . . . or his supervised release"). I will deny Tate's motion for summary judgment and grant defendants' motion for summary judgment on this claim.

Because I am granting summary judgment to defendants on all of Tate's claims, the entire case will be dismissed.

ORDER

IT IS ORDERED that:

1.  Plaintiff Sean Tate's motion for summary judgment, Dkt. 60, is DENIED.

2.  Defendants' motion for summary judgment, Dkt. 47, is GRANTED.

3.  The clerk of court is directed to enter judgment accordingly and close the case.

Entered June 28, 2023.

BY THE COURT:

/s/
_____

JAMES D. PETERSON
District Judge